105 A.3d 1234

COMMONWEALTH of Pennsylvania, Appellant,

v.

Terrance WILLIAMS, Appellee.

Commonwealth of Pennsylvania, Appellant,

v.

Terrance L. Williams, Appellee.

Supreme Court of Pennsylvania.

Submitted Sept. 18, 2013.

Decided Dec. 15, 2014.

See also 581 Pa. 57, 863 A.2d 505 and 637 F.3d 195.

534

Hugh J. Burns Jr., Esq., Philadelphia, for Commonwealth of Pennsylvania.

Peter Carr, Esq., Philadelphia District Attorney's Office, Amy Zapp, Esq., PA Office of Attorney General, for Commonwealth of Pennsylvania.

Billy Horatio Nolas, Esq., Federal Community Defender Office, Eastern District of PA, for Terrance Williams.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, STEVENS, JJ.

## *OPINION*

Justice EAKIN.

The Commonwealth appeals from the order granting a stay of execution, vacating appellee's death sentence, and awarding a new penalty hearing under the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541–9546. We vacate the stay of execution and the grant of a new penalty phase, and reinstate the sentence of death.

Appellee was sentenced to death after being convicted of the robbery and murder of Amos Norwood February 3, 1986, his second murder conviction. A detailed account of the crime is set forth in our opinion on direct appeal. *See Commonwealth v. Williams*, 524 Pa. 218, 570 A.2d 75, 77–79 (1990). Suffice it to say, appellee and his co-conspirator, Marc Draper, took Norwood to a graveyard, tied him with his own clothes, and beat him to death with a tire iron—appellee returned the next day and set fire to the corpse. At trial, appellee testified that Draper and another individual committed the crime; he claimed he was elsewhere at the time and uninvolved. He testified he did not know the victim, had never seen him before, and had no reason to be angry with him or wish to harm him. This Court affirmed the judgment of sentence February 8, 1990, *id.,* at 84, and appellee did not seek certiorari. He filed a timely PCRA petition March 24, 1995.

At the 1998 PCRA hearing, now represented by the Federal Community Defenders Office (FCDO), appellee abandoned his trial testimony and argued Norwood engaged in homosexual acts with him, and as set forth below, presented evidence

supporting this claim. The PCRA court denied relief, and this Court affirmed. *Commonwealth v. Williams*, 581 Pa. 57, 863 A.2d 505, 523 (2004). Appellee filed a second PCRA petition February 18, 2005, which was dismissed as untimely. This Court affirmed. *Commonwealth v. Williams*, 589 Pa. 355, 909 A.2d 297 (2006) (*per curiam*). Appellee filed a third PCRA petition June 1, 2005, which was dismissed as untimely, and we affirmed. *Commonwealth v. Williams*, 599 Pa. 495, 962 A.2d 609 (2009) (*per curiam*).

While that PCRA appeal was pending before this Court, appellee filed a federal *habeas corpus* petition December 19, 2005, which was denied. The Third Circuit affirmed. *Williams v. Beard*, 637 F.3d 195, 238 (3d Cir.2011). In his federal appeal, appellee contended trial counsel was ineffective for failing to present evidence he was psychologically damaged by years of sexual abuse, which infused him with rage toward men who made sexual advances toward him; appellee argued Norwood was one of these men and had been sexually abusing him since the age of 13. Appellee petitioned the United States Supreme Court for certiorari, which was denied. *Williams v. Wetzel*, —— U.S. ——, 133 S.Ct. 65, 183 L.Ed.2d 711 (2012) (*per curiam*).

On January 9, 2012, the FCDO visited Draper, who was serving a life sentence at SCI–Frackville. That same day, Draper signed an affidavit declaring he told detectives and the prosecution prior to trial that Norwood was a homosexual and was in a relationship with appellee. The affidavit also claimed the prosecution "wanted the motive to be a robbery and kept coming back to that. That's how they wanted me to testify, that it was a robbery." Draper's Affidavit, 1/9/12, at 4. The FCDO revisited Draper March 1, 2012, obtaining another affidavit with similar declarations.

Appellee then filed this facially untimely PCRA petition March 9, 2012, his fourth state petition for collateral review. On July 27, 2012, he filed a "Supplemental Petition for Post Conviction Relief and Notice of Filing Additional Evidence in Support of Stay of Execution," although no execution warrant had been signed. An execution warrant was subsequently

issued August 8, 2012, setting the execution for October 3, 2012. Appellee filed a "Renewed Motion for Stay of Execution" August 28, 2012, and the Commonwealth filed a response September 7, 2012. On September 6, 2012, appellee filed a motion for discovery, requesting the production of exculpatory information from the Commonwealth "as well as any reports or notes made concerning Norwood's sexual relationship or sexual abuse of [appellee] or any other child under the age of 18." Appellee's Motion for Discovery, 9/6/12, at 5–6.

On September 10, 2012, the PCRA court heard argument on the pleadings to determine whether the petition warranted an evidentiary hearing. The court gave appellee time to obtain and submit additional information from Draper, which led to his third affidavit, dated September 11, 2012. On September 14, the court heard additional argument and ordered an evidentiary hearing, which began September 20; only Draper and the trial prosecutor testified. On Saturday, September 22, the court ordered the Commonwealth to produce trial files and Philadelphia Police Department files and allowed both parties to review those files.[1] On September 24, documents from these files were offered and admitted into evidence, and the PCRA court entered 11 exhibits *sua sponte*. *See* Exhibit List, 9/20/12. The court then directed appellee to amend his PCRA petition; on September 28, appellee filed an "Amendment and Supplement to Petition for Post–Conviction Relief," requesting relief because the Commonwealth had given "sanitized" witness statements to the defense. The same afternoon, the court ruled there was a *Brady*[2] violation because that which was missing from original discovery suggested

---

1. The court's order included files for both the Norwood murder and the murder of Herbert Hamilton. Both murders had the same trial prosecutor, the same defendant (appellee), and the same key witness (Draper). In the Hamilton murder, appellee was receiving money from Hamilton in exchange for sex; appellee murdered Hamilton when he threatened to expose this relationship. Although the charge was first degree murder, the jury convicted appellee of third degree murder, about one year before the Norwood trial.

2. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Norwood may have been a "homosexual ephebophiliac." PCRA Court Opinion, 11/27/12, at 12–13 (citations omitted).[3]

The PCRA court also concluded appellee's fourth PCRA petition met the "governmental interference" exception to the PCRA's timeliness requirement, 42 Pa.C.S. § 9545(b)(1)(i),[4] though it did not meet the "newly-discovered evidence" exception, *id.*, § 9545(b)(1)(ii).[5] The court ordered a stay of execution pursuant to § 9545(c)(2),[6] finding appellee exceeded the "strong likelihood" threshold and demonstrated actual success on the merits of his claim regarding the penalty phase. The court held the Commonwealth violated *Brady* and found appellee identified a specific claim, Norwood's homosexual ephebophilia, which he was unable to discover or develop due to interference by the Commonwealth. The interference consisted of withholding or "sanitizing" three specific pieces of evidence: a statement by Norwood's wife, a statement by the pastor of appellee's church, and notes made by the prosecutor.

The first statement involved a story Norwood's wife told police, which was omitted from the 1984 police activity sheet. She said Norwood once woke her at 2 a.m. and asked her for money while a young male stood in the hall outside their bedroom. She saw Norwood load stereo equipment into his car and drive away with the young male. She told police she believed this to be a kidnapping; when Norwood returned

3. The PCRA court defined "homosexual ephebophilia" as a psychological term for the attraction to "young men," both adults and adolescents. *See id.*, at 13 n. 32.

4. Subsection (b)(1)(i) provides an untimely PCRA petition falls within an exception if the petitioner proves: "the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States[.]" *Id.*

5. Subsection (b)(1)(ii) provides an exception for an untimely PCRA petition if the petitioner proves: "the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence[.]" *Id.*

6. Subsection (c)(2) states no stay may be issued unless a PCRA petition meeting all requirements of this subchapter of the PCRA has been filed and is pending, and the petitioner makes "a strong showing of likelihood of success on the merits." *Id.*, § 9545(c)(2).

home around 9 a.m., he said he was abducted but escaped by using psychology on his captors. When his wife tried to call the police, Norwood asked her to avoid their involvement.

The second statement was from appellee's pastor, who was also a friend of Norwood. The pastor told police Norwood worked with and counseled young males in the church for many years. Omitted from the 1984 activity sheet was the pastor's suspicion that Norwood may have been a homosexual, and that five years earlier, the pastor received a complaint from a mother alleging Norwood propositioned her 17–year-old son for sex. The pastor also repeated for police the "kidnapping" story told by Norwood's wife—this was included with the pastor's statements in the 1984 police activity sheet, which had been disclosed to the defense.

The court also found the Commonwealth failed to disclose handwritten notes by the trial prosecutor, purportedly re-counting an instance of Norwood's behavior toward a teenage male, which would establish the prosecution's awareness of Norwood's homosexual proclivities. The court stated, had such evidence been disclosed to the defense, trial counsel would have been able to challenge the Commonwealth's sympathetic portrayal of Norwood. The court concluded the inability to portray an unsympathetic victim was enough to undermine one's confidence the jury would have returned the same verdict of death.[7]

Finding appellee exercised due diligence, the court conclud-ed he did not know this evidence existed until his co-conspira-tor executed an affidavit in January, 2012, declaring a possible motive for the crime, i.e., rage over being sexually abused by

---

7. The court also stated the Commonwealth interfered with appellee's *Brady* claim by "disput[ing] the existence of information in [its] files about [ ] Norwood's homosexual ephebophilia" when the Common-wealth represented to the 1998 PCRA court that the only evidence involved in the case was appellee's knowledge that Norwood was a homosexual and his plan to extort money from Norwood but mentioned nothing about the additional "homosexual ephebophilia" evidence. PCRA Court Opinion, 11/27/12, at 15–17. The court added a supple-mental opinion to its PCRA opinion, describing additional instances that led it to conclude the prosecution exhibited "gamesmanship." *See id.* app., at 1–15.

Norwood. Appellee timely filed his PCRA petition within 60 days of learning the substance of Draper's affidavit. Furthermore, the court noted appellee could not have known the Commonwealth interfered with his ability to present evidence of Norwood's homosexual ephebophilia until the underlying evidence was uncovered during the hearing held as a result of Draper's affidavit; therefore, appellee timely filed the amendment and supplement to his PCRA petition in order to particularize his *Brady* claim just three days after government files were opened. Accordingly, the court concluded appellee met his burden under 42 Pa.C.S. § 9545(b)(1)(i), and subsection (b)(2), so it had jurisdiction to grant relief. Finding appellee established his *Brady* claim, the court held he was entitled to a new penalty hearing. The court denied relief regarding the guilt phase. The Commonwealth filed this appeal, raising two issues for our review regarding the timeliness of appellee's fourth PCRA petition and the merits of his *Brady* claim.[8]

Our standard of review of the PCRA court's grant of relief is clear: we examine whether the court's findings are supported by the record and whether its conclusions of law are free from legal error. *Commonwealth v. Colavita,* 606 Pa. 1, 993 A.2d 874, 886 (2010). All PCRA petitions, "including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final" unless an exception to timeliness applies. 42 Pa.C.S. § 9545(b)(1). "The PCRA's time restrictions are jurisdictional in nature. Thus, [i]f a PCRA petition is untimely, neither this Court nor the [PCRA] court has jurisdiction over the petition. Without jurisdiction, we simply do not have the legal authority to address the substantive claims." *Commonwealth v. Chester,* 586 Pa. 468, 895 A.2d 520, 522 (2006) (first alteration in original) (internal

8. The Commonwealth's issues, set forth *verbatim,* are:
    I. Was [appellee]'s fourth PCRA petition, in which he alleged a violation of *Brady[ ]* based on the non-disclosure of information he had known since before trial, untimely?
    II. In any event, was [appellee]'s *Brady* claim meritless where the information in question would not have been reasonably likely to change the outcome, had no apparent exculpatory value, and had been known all along by [him]?
    Commonwealth's Brief, at 3.

citations and quotation marks omitted). As timeliness is distinct from the merits of the underlying claims, we must first determine whether appellee's PCRA petition was timely filed in order to decide whether this Court has legal authority to address its substantive claims. *See Commonwealth v. Stokes*, 598 Pa. 574, 959 A.2d 306, 310 (2008) (consideration of *Brady* claim separate from consideration of its timeliness).

■ This, appellee's fourth PCRA petition, was untimely on its face, as it was filed over 20 years after his judgment of sentence became final. The PCRA petitioner has the burden of proving an untimely petition falls within an exception outlined in § 9545(b)(1). *See Commonwealth v. Hawkins*, 598 Pa. 85, 953 A.2d 1248, 1253 (2008) ("[I]t is the [petitioner]'s burden to allege and prove that one of the timeliness exceptions applies." (citation omitted)). Furthermore, any PCRA petition filed under a timeliness exception must be filed within 60 days of when the petition could have first been presented. 42 Pa.C.S. § 9545(b)(2). " '[T]he 60-day rule requires a petitioner to plead and prove that the information on which he relies could not have been obtained earlier, despite the exercise of due diligence.' " *Commonwealth v. Albrecht*, 606 Pa. 64, 994 A.2d 1091, 1094 (2010) (quoting *Stokes*, at 310).

■ Although a *Brady* violation might fall within the "governmental interference" exception, § 9545(b)(1)(i) nonetheless requires a petitioner to plead and prove: (1) the failure to previously raise the claim was the result of interference by government officials and (2) the information on which he relies could not have been obtained earlier with the exercise of due diligence. *Commonwealth v. Abu–Jamal*, 596 Pa. 219, 941 A.2d 1263, 1268 (2008) (citation omitted). The merits of a *Brady* claim need not be addressed until it is established that the instant petition was timely filed. *Stokes*, at 310. Thus, the proper questions for our review are whether the Commonwealth interfered with appellee's ability to present a claim that Norwood was a homosexual with a sexual attraction to teenage males, and whether appellee was duly diligent in obtaining such information.

The PCRA court held it had jurisdiction under the "governmental interference" exception to the PCRA's time-bar, concluding the alleged *Brady* violations posited by appellee met the requirements of 42 Pa.C.S. § 9545(b)(1)(i). The Commonwealth contends appellee's PCRA petition failed to establish this exception, as appellee would have known well before trial of any sexual relationship or abuse between Norwood and himself. In fact, the Commonwealth argues, if anyone knew about Norwood's homosexual proclivities toward teenage males, it was appellee himself. The Commonwealth points to the evidence of appellee's statements during the murder, taunting Norwood for "liking boys," and appellee's plan to extort Norwood by threatening to expose his homosexual activity.

Further, the Commonwealth contends appellee not only could have presented evidence of ephebophilia much sooner, but points out appellee did present just such a claim during his first PCRA proceedings in 1998, where he offered testimony from several witnesses alleging Norwood sexually abused him. The Commonwealth also posits that appellee's instant PCRA petition admitted he knew about Norwood's homosexual tendencies years before the murder. Since appellee already knew about this alleged material evidence, the Commonwealth contends any "sanitization" of evidence by the prosecution does not amount to a *Brady* violation. Accordingly, the Commonwealth asserts, appellee did not prove the timeliness exception applies, and the PCRA court was without jurisdiction to rule on appellee's petition, much less grant a stay of execution and a new penalty phase.

The Commonwealth also suggests the PCRA court attempted to circumvent a valid death sentence and undermine the integrity of this Court's ruling in appellee's first PCRA appeal. The Commonwealth refers to the ordering of what amounted to additional discovery to supplement appellee's inadequate petition, the court's lengthy examination of the trial prosecutor after PCRA counsel finished his examination, and the admission of "court exhibits" *sua sponte,* later basing its "governmental interference" decision on one of its own exhib-

its. In sum, the Commonwealth contends the PCRA court "went to great lengths to expand the record, to reshape [appellee]'s claim, and to limit the Commonwealth." Commonwealth's Reply to Defendant's Response to Emergency Application to Lift Illegal Stay of Execution, 10/2/12, at 12. The Commonwealth, therefore, requests we vacate the stay of execution and the grant of a new penalty phase.

Appellee argues the PCRA court's timeliness findings were supported by the record and devoid of legal error. While appellee admits he had prior knowledge of Norwood's sexual orientation, he contends such prior knowledge is critically different from evidence of homosexual ephebophilia and sexual abuse of other teenage males. He distinguishes the failure to present the defense of rage at trial, his 1998 ineffectiveness claim, from the inability to present Norwood as unsympathetic, and repeats that knowledge of homosexuality is not the same as knowledge of homosexual ephebophilia, insofar as it relates to the ability to paint an unsympathetic picture of Norwood.

Appellee argues he met § 9545(b)(1)(i)'s exception because the Commonwealth interfered with his ability to proffer this particular *Brady* claim, and that he exercised due diligence by presenting the claim within 60 days of obtaining the facts on which the claim was based. Further, appellee asserts a PCRA petitioner's previous knowledge of a fact applies only to § 9545(b)(1)(ii)'s newly-discovered evidence exception, not § 9545(b)(1)(i), alleging the Commonwealth is required to disclose evidence in its possession even if the defense has previous knowledge or other information about that fact, and the failure to disclose such evidence violates *Brady*, constituting governmental interference with the ability to present a *Brady* claim.

■ Our examination of the three omissions alleged leads to the inescapable conclusion that appellee is not entitled to relief. The missing reports were found to be relevant to Norwood's character, but the failure to explore or exploit that character was not a result of governmental interference—

there is abundant evidence appellee knew of Norwood's homosexuality and conduct with teenage boys well before trial, sufficient to present him as unsympathetic before the jury. Appellee himself was a teenage male admittedly engaged in homosexual acts with Norwood. Although he denied any involvement in the crime at trial, evidence included his plan to extort Norwood by threating to expose him for being a homosexual, and statements in which Draper and appellee taunted Norwood for "liking boys" while they were beating him. N.T. Trial, 1/22/86, at 667–68; N.T. Trial, 1/23/86, at 813–14; *see also* N.T. PCRA Hearing, 9/20/12, at 219; N.T. PCRA Hearing Vol. 2, 9/24/12, at 13. Draper testified at trial that appellee told him Norwood was a homosexual. N.T. Trial, 1/23/86, at 814. We agree with the courts that have previously considered appellee's claims based on sexual orientation—there is no reasonable conclusion that the result of a trial for this horrific crime would have been different had the missing information been provided as appellee would have liked.

Further, evidence offered at appellee's first PCRA hearing in 1998 demonstrated the extent of available knowledge of Norwood's sexual appetites. At that proceeding, counsel offered three expert witnesses, all of whom testified appellee and Norwood were in a homosexual relationship in which appellee was abused by Norwood; they suggested the murder was an "enraged killing" in response to the sexual abuse. *See* N.T. PCRA Hearing, 4/8/98, at 106, 115, 156–59, 186; N.T. PCRA Hearing, 4/9/98, at 360–61, 375–76; N.T. PCRA Hearing, 4/13/98, at 540, 542–44, 551–54, 569–70. Additionally, appellee's high school teacher, who was also a private psychotherapist, testified Norwood molested young boys, including appellee, and he learned this information from several people in early 1997. N.T. PCRA Hearing, 4/8/98, at 226–33. Appellee's friend, Donald Fisher, who was also in a homosexual relationship with appellee for approximately five years, testified appellee and Norwood began a homosexual relationship when appellee was approximately 15 years old, which lasted a few years, and Norwood was abusive, liked to inflict pain, and

enjoyed having sex with teenage males. N.T. PCRA Hearing, 4/13/98, at 597, 602–05, 617. Fisher also testified appellee would engage in homosexual acts with Norwood for money, alcohol, and other gifts. *Id.,* at 617–18. Fisher learned this information not only from observing the relationship between appellee and Norwood but also because appellee told Fisher. *Id.* Additionally, the defense stated throughout the hearings that its mitigation witnesses were offered to show Norwood molested young males and to demonstrate trial counsel's ineffectiveness in investigating the homosexual relationship between appellee and Norwood and the abuse involved in that relationship. *See* N.T. PCRA Hearing, 4/8/98, at 235–37; N.T. PCRA Hearing, 4/13/98, at 603.

Appellee's prior knowledge was also evident at his federal *habeas corpus* proceeding, during which he alleged Norwood was a closeted homosexual from whom he could extort cash by threatening to expose Norwood's secret to his wife. *Williams,* 637 F.3d at 200. Analyzing the record from appellee's first PCRA proceeding, the Third Circuit noted appellee and Norwood began their homosexual relationship when appellee was approximately 13 years old. *Id.,* at 229. The court stated Norwood was physically abusive toward appellee, once allegedly beating him with a belt. *Id.,* at 229–30. The federal district court also elicited testimony from appellee's first PCRA proceeding showing Norwood was a homosexual with whom appellee had sex in exchange for money, drugs, and gifts. *See Williams v. Beard,* 2007 U.S. Dist. LEXIS 41310, at *106 n. 32 (E.D.Pa. May 8, 2007).

The PCRA court itself acknowledged appellee's arguments from the 1998 PCRA hearing supported his prior knowledge, stating appellee "elicited evidence from [ ] Fisher that [ ] Norwood was very degrading and he liked to have sex with kids. However, the current claim does not rest solely upon that evidence." *See* N.T. PCRA Hearing, 9/28/12, at 21. The court also noted the defense, at the time of trial, indeed had information suggesting Norwood was a homosexual—a statement from a witness disclosing appellee told him Norwood " 'was a homosexual and was the type to pay people.' " *Id.,* at

27–28. Appellee's PCRA counsel also referenced his prior knowledge at the hearings. *See* N.T. PCRA Hearing, 9/10/12, at 24 ("[W]e tried to present in prior proceedings evidence about the sexual abuse by [ ] Norwood of [appellee.]").

And quite tellingly, Draper's affidavits established he knew appellee and Norwood were in a homosexual relationship— "[appellee] had also told me that Norwood was gay" and during the murder, "[appellee] was yelling 'so you like boys, so you like boys' as he hit Norwood"—and appellee told Draper the murder was about the homosexual relationship. Draper's Affidavit, 9/11/12, at 2–4. Draper confirmed appellee's prior knowledge of Norwood's homosexual proclivities repeatedly in his PCRA testimony. *See* N.T. PCRA Hearing, 9/20/12, at 219; N.T. PCRA Hearing Vol. 1, 9/24/12, at 88, 93, 96; N.T. PCRA Hearing Vol. 2, 9/24/12, at 12–13.

The evidence alleged to comprise the *Brady* violation does not include information unknown to appellee, or information he would have been unable to find on his own. The "kidnapping" story told by Norwood's wife indicates that a probably untruthful story was told to her, but nothing more. The PCRA court apparently read between the lines and presumed the story was a lie to hide Norwood's homosexuality from his wife. And although this story was omitted from the wife's statements in the 1984 police activity sheet, it was disclosed with the pastor's statements in the same sheet. That is, appellee was already aware of this story, whatever its value, through other means. *See* Reverend's Disclosed Statement, Exhibit C–2, PCRA Hearing, 9/20/12, at 5. Since appellee had it, the government did not interfere with his ability to obtain it.

The pastor's suggestion that he suspected Norwood may have been a homosexual would hardly have surprised appellee, who knew that for years. The government did not keep appellee from ferreting out the reverend, even if his opinion might have been admissible. The pastor's report that he once received a complaint alleging Norwood propositioned a teenage male would have been equally unsurprising. These allegations confirmed what appellee already knew—Norwood was

a homosexual with attraction toward teenage males, like himself.[9] There simply is no surprise in this revelation, no new information or insinuation that only now suggests Norwood might be made to look "unsympathetic."

The third "interference" involves nondisclosure of handwritten notes of the trial prosecutor; the PCRA court concluded they recounted a specific instance of homosexual ephebophilia. *In toto,* the notes read, "[N]ot true—Mrs. House—son in play—Ronald—16 yrs.[sic]—touched on privates—I don't do that—nobody wd [sic] have to know—brought boy home [and] asked him not to say anything @ [sic] the—he stopped coming to church—disappeared—never verified it—29 yrs. [sic]—1st X[sic]—never heard from others @ [sic] possible incidents." *See* Exhibit Court-2, PCRA Hearing, 9/20/12, at 2. The court *sua sponte* admitted these cryptic notes into evidence and used them to question the trial prosecutor.[10]

These murky notes, if decipherable with any degree of confidence, do not indicate the origin or veracity of their content; they do not indicate whether the notes were written during a witness interview, much less who was being interviewed. Indeed, they start with the notation "not true." They do not mention Norwood, whose connection to the notes we are asked to insinuate. One could infer they involve the incident omitted from the pastor's statements in the 1984 police activity sheet, where a mother told of Norwood's propositioning her teenage son. However, next to appellee's own evidence at the 1998 hearing, it adds little or nothing whatsoever to the information available and already presented. The ability to pursue the mitigating tactic of making Norwood appear unsympathetic was not created by these notes.

9. The reverend refused to make these statements in writing but related them to police in confidence. He stated, "[H]e himself handled the matter internally and the complaint never went any further than that." *See* Police Activity Sheet, Exhibit P–24, PCRA Hearing, 9/20/12.

10. Although the Commonwealth contends the PCRA court violated Pa.R.Crim.P. 902(E)(1) in the "Statement of the Case" section of its brief, *see* Commonwealth's Brief, at 19, the Commonwealth does not raise a discovery issue on appeal; thus, we will not address discovery matters. *See* Pa.R.A.P. 302(a).

Lastly, we note a measure of bootstrapping in appellee's argument. It is difficult to conclude appellee learned something new from Draper's latest affidavit, as Draper's information was derived from appellee's own statements to Draper prior to and at the time of the murder. Further, Draper's suggestion that appellee was enraged at the time of the murder depends on Norwood's prior abuse of appellee, which necessarily establishes appellee's knowledge of Norwood's proclivities before trial. Thus, any failure to previously raise this claim was not the result of governmental interference. *See Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726, 730 (2002) ("[N]o *Brady* violation occurs where parties had equal access to the information or if the defendant knew or could have uncovered such evidence with reasonable diligence." (citation omitted)); *see also Commonwealth v. Morris,* 573 Pa. 157, 822 A.2d 684, 696–97 (2003).

Like appellee's failed effort to establish a timeliness exception, his *Brady* claim provides no grounds for PCRA relief because the claim is inapposite to the necessary materiality inquiry. The United States Supreme Court has never held *Brady* materiality is measured in terms of "effects on the defense strategy." *See Commonwealth v. Weiss,* 622 Pa. 663, 81 A.3d 767, 810–11 (2013) (Castille, C.J., concurring, joined by Eakin, J.). Further, *Brady* does not permit a defendant to shield himself from his prior perjury at trial. *See id.,* at 811–13.

Appellee's *Brady* theory suggested that had he received additional information about Norwood's homosexual proclivities, his defense would have learned his actual motive for the murder, *i.e.,* rage over being sexually abused by Norwood, which, in turn, would possibly lead to a new strategy where appellee does not perjure himself and Norwood is portrayed unsympathetically. Yet, at the time of trial, appellee was aware of potential witnesses and information that would establish Norwood's homosexual attraction to teenage males. Appellee could have used his prior knowledge and his counsel's due diligence to obtain additional information and witnesses to support a different trial theory than that presented. He could

have argued Norwood's homosexual proclivities developed into sexual abuse, leading to rage and ultimate murder of Norwood. He could also have created a portrait of Norwood consistent with that now proffered. However, appellee chose not to do so.

Instead, appellee perjured himself at trial, testifying he did not know the victim, had never seen him before, took no part in the murder, and had no reason to be angry with him or wish to harm him. The defense he chose to present disclaimed knowledge of Norwood, which is antithetical to what he knew and could have presented—evidence that showed Norwood as a molester, which may have led to establishing a motive of rage, or evidence allowing him to depict Norwood as an unsavory character and sexual predator. Given the choice of defense, such strategies were not relevant.[11] Given the details of appellee's crime, showing the jury the victim was "unsympathetic" was not a plan that was likely to cause reciprocal sympathy for the man who bludgeoned him and incinerated his body. Regardless, this alleged "sanitized information" claim, coupled with the possible effect on appellee's defense strategy, lacks any basis under *Brady*, as it is neither exculpatory nor material. *See Weiss*, at 810–13 (Castille, C.J., concurring, joined by Eakin, J.). In sum, the Commonwealth did not obstruct appellee's ability to present Norwood as unsympathetic. Appellee had prior knowledge of the information on which he based his *Brady* claim, and could have presented the claim much sooner—prior to trial or at any time over the last 20 years. Because appellee's theory was built on perjury, and the information on which he relied was not exculpatory, the PCRA court erred in finding his claim material under *Brady*. Accordingly, the record does not support the PCRA court's finding appellee established his burden of proof regarding the "governmental interference" exception. *See*

11. Trial counsel indicated at a hearing on appellee's post-sentence motions that he was left with using appellee's youth as a potential mitigating factor—since appellee provided him little, if any, assistance, he was frustrated in efforts to present a compelling group of character witnesses on his behalf. *See* N.T. Post–Sentence Motions, 4/24/87, at 21–27.

*Abu–Jamal,* at 1268 (citation omitted). Because the PCRA court was thus without jurisdiction to consider the merits of this petition, *see Hawkins,* at 1252 (citations omitted), we vacate the court's order, dismiss this petition as time-barred, and reinstate the judgment of sentence of death. The Prothonotary is directed to transmit the complete record in this case to the Governor pursuant to 42 Pa.C.S. § 9711(i).

Order vacated; petition dismissed; judgment of sentence reinstated.

Jurisdiction relinquished.

Chief Justice CASTILLE and Justices BAER and STEVENS join the opinion.

Chief Justice CASTILLE files a concurring opinion.

Justices SAYLOR and TODD concur in the result.

Chief Justice CASTILLE, concurring.

I join the Majority Opinion. Indeed, in my view, both the *Brady*[1] claim appellee initially raised, and the *Brady* claim later uncovered by the PCRA[2] court and upon which the court granted relief, are time-barred and frivolous. I write separately to expand upon the Majority discussion, and to address the important responsibilities of the PCRA trial courts in serial capital PCRA matters, an issue brought into stark relief by the extraordinary, and unauthorized, measures undertaken by the PCRA court in this case.

Preliminarily, with respect to the latter concern, I note that this is a case involving a **fourth** PCRA petition filed by federal lawyers only after appellee was denied federal *habeas corpus* relief. The fourth petition was time-barred on its face— offering a new, recanting witness (a friend and cohort of appellee) for the same "facts" and theory appellee had long-known and already litigated—and was blatantly frivolous, filed by the FCDO[3] in a transparent effort to induce further delay.

1. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
2. Post Conviction Relief Act, 42 Pa.C.S. §§ 9541–9546.
3. Federal Community Defender's Office.

Rather than decide the claim actually presented in the efficient manner this sort of last-ditch capital litigation requires, the court below unfortunately strayed from its institutional duties. In the process, the PCRA court: ignored the strictures of PCRA jurisdiction and the appropriate parameters for discovery procedures and evidentiary hearings in serial petition matters; misapprehended what *Brady* discovery encompasses; misapprehended the substantive law concerning *Brady* materiality; and, most troubling, lost sight of its role as a neutral judicial officer. As a result, a warrant of execution was enjoined by a trial judge for no valid reason, on the basis of a frivolous fourth PCRA petition, leaving insufficient time for this Court to timely review the judge's injunction of the Governor's warrant.[4]

The PCRA court per the Honorable Teresa Sarmina, justified its actions based on what it viewed as gamesmanship by the Commonwealth in allegedly withholding relevant information from appellee. If trial level prosecutorial "gamesmanship" is revealed and is relevant, it obviously warrants notation and condemnation. But, to be relevant in a case involving a fourth PCRA petition raising a *Brady* claim, the petition would have to be proven timely (to vest jurisdiction), and the uncovered *Brady* claim would need to possess merit, which both the claim raised in this petition, and the different claim found by the PCRA court, do not. Furthermore, in the *Brady* arena, before condemning officers of the court, the tribunal should be aware of the substantive status of *Brady* law both at the relevant time and today.[5] And, just as a preview: *Brady*

4. Appellee cross-appealed the order below, presumably to the extent the PCRA court denied his other claims, but later discontinued that appeal by praecipe. *See* 673 CAP.

5. To the extent the alleged non-disclosures here involved matters found when the PCRA court searched police files, it should be stressed that the investigation and prosecution (murder in 1984; conviction in 1986) preceded, by many years, the U.S. Supreme Court's decision in *Kyles v. Whitley*, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), which first held that the prosecution's *Brady* obligation extends to exculpatory materials known to others acting on the relevant government's behalf, including the police. Prior to *Kyles*, in Pennsylvania, the law was that prosecutors were not responsible for the content in police files. *See Commonwealth v. Burke*, 566 Pa. 402, 781 A.2d 1136 (2001)

does not authorize searching through the government's files—not at trial, not on collateral attack, and especially not on a fourth PCRA petition. This case presents a supervisory issue concerning the manner in which trial courts handle serial petitions in capital cases that I believe requires highlighting and disapproval.

As noted, I will write also to expand upon why the claim raised by appellee, as well as the different claim discovered by the PCRA court, misconceives *Brady*.

## I. The FCDO Agenda as Necessary Prologue

As I noted in a recent case involving a retroactive *Atkins*[6] claim raised by the FCDO: The FCDO's significant federal resources, "represented by its cadre of lawyers and roster of experts, are deployed throughout the Commonwealth; individual trial courts, and county prosecutors for that matter, who see only the occasional capital case, may be unaware of the bigger picture, and the strategy at work. This extraordinary shadow capability of the FCDO, and its demonstrated tactics, give me additional pause...." *Commonwealth v. Hackett*, 626 Pa. 567, 99 A.3d 11, 40–41 (2014) (Castille, C.J., concurring). It has only recently emerged just how pervasive a presence the FCDO has made itself in Pennsylvania capital cases. Almost invariably without legitimate court appointment, and without any Pennsylvania authority's approval or role of oversight, this "private" group of federal lawyers pursuing an obstructionist anti-death penalty agenda have essentially anointed themselves as a statewide, *de facto* capital defender's

(abrogating prior cases). The consequent distortions in this case are not unusual in this unique area of law where cases continue to be litigated decades after trial, and federal lawyers contend that new rules or innovative rules govern collateral attacks on old cases. Any finding of misconduct respecting this nearly thirty-year old case, then—and I do not dispute the concern, even if there was zero exculpatory material to support a viable *Brady* claim—must be tempered by awareness of the governing law at the relevant times, as well as the fact that the *Brady* focus is not on any evidence, but only on exculpatory evidence and materiality.

6. *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

office. Common tactics of the FCDO include multiple attempts to delay and obstruct cases, as well as attempts to unsettle and undermine Pennsylvania law. *See generally Commonwealth v. Spotz*, 627 Pa. 257, 99 A.3d 866 (2014) (Single Justice Opinion on Post–Decisional Motions by Castille, C.J.) (collecting cases and tactics).

One common tactic is that, immediately after one round of review fails, the FCDO "discovers" a new claim and initiates a new round of delay-inducing review. *See, e.g., id.; Commonwealth v. Porter*, 613 Pa. 510, 35 A.3d 4 (2012); *Commonwealth v. Abdul–Salaam*, 606 Pa. 214, 996 A.2d 482 (2010). In this case, that is exactly what the FCDO did. Appellee already had a full direct appeal, three rounds of PCRA review and appeal, and a full round of federal *habeas corpus* review and appeal when the FCDO happened upon "new" evidence and filed this fourth PCRA petition which, in fact, merely reiterated the same evidence and a theory it had already litigated and which was found to be meritless. The PCRA court below should have decided the claim actually presented to it, while maintaining a proper perspective. And, it has become apparent that PCRA courts throughout Pennsylvania need to be vigilant and circumspect when it comes to the activities of this particular advocacy group, to ensure that the FCDO does not turn PCRA proceedings, and in particular serial proceedings, into a circus where FCDO lawyers are the ringmasters, with their parrots and puppets as a sideshow.

## II. The *Brady* Issue Raised by the FCDO was Time–Barred and Frivolous

This fourth PCRA petition was filed by the FCDO in March of 2012, immediately after appellee's federal *habeas* attack on his conviction failed. Appellee's final appropriate prospect for relief was through mercy: the clemency process. The FCDO was appointed to represent appellee for purposes of pursuing state clemency. Nevertheless, the FCDO proceeded to file yet another PCRA petition.

The FCDO alleged prosecutorial suppression of information allegedly provided to the police and the prosecutor during

witness preparation sessions by appellee's friend and cohort-in-murder Marc Draper—who was convicted for his own role in the murder and is serving life in prison, who testified contrarily at appellee's trial, and has nothing to lose by now lying for his friend—and the Reverend Charles Poindexter. Draper claimed that he had told the arresting officers, as well as the prosecutor, that the victim, Amos Norwood, was a homosexual, that Norwood and appellee were involved in a sexual relationship, and that the murder was about that relationship. What was obfuscated by Draper and the FCDO was that this information could only have been learned through appellee's own communications with Draper, since appellee obviously knew his "true" motivation; or else it was just Draper's irrelevant opinion. Draper further claimed that police told him to testify that the motive for the murder was robbery. Appellee also included a "declaration" from Poindexter (who had testified for the Commonwealth at the guilt phase of trial), claiming he had learned from police that the victim would sometimes meet gay men in a house or an apartment.

From this information, the FCDO constructed a claim that the Commonwealth suppressed "exculpatory" evidence of the relationship between appellee and the victim and appellee's supposed "true" motivation for the murder—again, as if appellee himself did not know his own true motivation—which could have been used to rebut elements of first-degree murder and to undermine the death penalty. The argument was akin to a "bad faith" argument, *i.e.*, the Commonwealth had argued that a churchgoing man was robbed and murdered by appellee and Draper, despite knowing that appellee may have had a different relationship with the victim, and a different motivation that he was keeping to himself.

As the Majority explains, the information alleged in this fourth petition not only was obviously known to appellee, but it also was irrelevant to the trial proceedings (the focus of *Brady* ) because the defense—offered through appellee's testimony—was one of innocence and non-involvement. In short, appellee chose to lie. In addition, the Draper and Poindexter

statements—conveniently secured by the FCDO only after losing in federal court—rehashed the same information concerning the victim's character and appellee's "true" motivation for the murder already litigated in the first PCRA proceeding. Thus, the FCDO's last-ditch *Brady* claim consisted of evidence already known to appellee, a claim already litigated by appellee, and a contrary defense theory springing from an admission that appellee perjured himself at trial. The PCRA court should have taken the frivolous issue as the FCDO presented it and dismissed it as time-barred. The court inexplicably did not; and instead, the frivolous issue now before this Court is a different *Brady* claim never raised by appellee until prompted to do so by the PCRA court, after the issue was uncovered by the PCRA court itself only by losing sight of fundamental precepts, including its role as neutral arbiter.

### III. PCRA Court's "Discovery"

A PCRA court is without jurisdiction when a serial petition is filed (assuming it is filed more than one year from the date the judgment of sentence became final, as it was here) unless it falls within one of three limited exceptions. 42 Pa.C.S. § 9545. In all PCRA petitions, the burden is on the PCRA petitioner to establish an exception to the one-year jurisdictional time-bar, before the court can act. Moreover, the rules governing discovery in PCRA matters explicitly state that no discovery is permitted for first counseled petitions except "upon leave of court after a showing of good cause," Pa. R.Crim.P. 902(E)(2); while in serial cases such as this one, discovery is not permitted "except upon leave of court after a showing of exceptional circumstances." Rule 902(E)(1). These are this Court's Rules: not niceties to be done away with perhaps because of some unease with capital cases.

Nothing in the Rules authorizes a PCRA court to demand the government's thirty-year-old files and for the court itself to go searching for information and new claims—all without jurisdiction being established. This is true whether the case is a capital case or not—the difference of a death sentence

does not create jurisdiction, or derivative power, where it does not exist.

These Rules are neither arbitrary nor mere aspirations. The PCRA Rules square with *Brady,* which does not command an open-file policy, or a "sporting system" of discovery. *See Brady,* 373 U.S. at 90–91, 83 S.Ct. 1194. Thus, even where, unlike here, serial petition jurisdiction is established and the petitioner demonstrates exceptional circumstances to warrant some form of discovery, such orders do not properly encompass simply seizing and rummaging about in the government's files.

[T]he [U.S. Supreme] Court has noted that the duty imposed upon the prosecution under *Brady* is a limited one. *See, e.g., Weatherford v. Bursey,* 429 U.S. 545, 559, 97 S.Ct. 837, 846, 51 L.Ed.2d 30 (1977) ("[t]here is no general constitutional right to discovery in a criminal case, and *Brady* did not create one"); *see also Kyles,* 514 U.S. at 436–37, 115 S.Ct. at 1567 ("[T]he Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense. . . . We have never held that the Constitution demands an open file policy. . . ."). This Court has also recognized *Brady's* limited requirements, and has noted that *Brady* does not grant a criminal defendant unfettered access to the Commonwealth's files. *See Commonwealth v. Edmiston,* 578 Pa. 284, 851 A.2d 883, 887 n. 3 (2004) (defendant has no general right under the Constitution or Brady to search Commonwealth files); *Commonwealth v. Williams,* 557 Pa. 207, 732 A.2d 1167, 1176 (1999) ("[T]he Commonwealth is, in the first instance, the judge of what information must be disclosed. . . . 'Defense counsel has no constitutional right to conduct his own search of the State's files to argue relevance.' ") (quoting *Pennsylvania v. Ritchie,* 480 U.S. 39, 59, 107 S.Ct. 989, 1002, 94 L.Ed.2d 40 (1987)); *Commonwealth v. Counterman,* 553 Pa. 370, 719 A.2d 284, 297 (1998), *cert. denied,* 528 U.S. 836, 120 S.Ct. 97, 145 L.Ed.2d 82 (1999) (*Brady* is not a general rule of discovery in criminal cases).

*Commonwealth v. Lambert*, 584 Pa. 461, 884 A.2d 848, 854 (2005).

This Court's Rules, likewise and for similar good reason, do not empower a PCRA judge to hold evidentiary hearings in a serial petition case in advance of a demonstration of jurisdiction. Appellee already had five full rounds of review. Hearings are appropriate—after jurisdiction is established—only if there has already been an actual demonstration of a genuine issue concerning any material fact. *See* Pa.R.Crim.P. 908(A)(2), 909(b)(2). A new and different *Brady* claim discovered by the PCRA judge's own unauthorized, and unlimited, "investigation"—conducted after a serial PCRA petition is filed and not yet assessed for jurisdiction—cannot operate to render the petition timely when filed. Likewise, information obtained from the government's files after the PCRA court improperly ordered seizure of the information without foundation cannot retroactively operate to validate the improper serial petition "discovery" order (or "seizure" order, in this case) in the first instance.

During one of the earliest hearings after an execution date was set in this matter, the PCRA court recognized that Draper's affidavit was insufficient to warrant an evidentiary hearing. Nevertheless, the court essentially directed appellee to procure a third affidavit from Draper to see whether appellee could establish a strong showing of success on the merits which, in the mind of the court, was necessary in order to warrant an evidentiary hearing with a death warrant pending. N.T., 9/10/12, at 86–87. Following submission of the third affidavit, the court then ordered an evidentiary hearing to receive testimony from Draper and the trial prosecutor (who was no longer with the District Attorney's Office). Prior to this hearing, the court entered an order prohibiting the parties from communicating about the case with Draper or the trial prosecutor and further ordered the trial prosecutor to bring any documents in her possession related to the case to the evidentiary hearing. The court then ordered the prosecutor's office to give access to the case files to the trial prosecutor, via an e-mail the judge sent to the parties.

A subsequent e-mail from the court took the even more lawless step of essentially opening the prosecutor's files to appellee's counsel, as the judge directed that appellee was permitted to review any of the documents reviewed by the trial prosecutor. Then, in another e-mail sent on Saturday, September 22, 2012, the court's clerk directed the Commonwealth to secure the police department's homicide files in this case and the Herbert Hamilton murder case [7] because "the judge wants to review everything in the possession of the police department about these two cases." *See* Attachment to "Commonwealth's Motion to Complete the Record," filed 10/26/12. The PCRA court's examination of these files provided the basis for the examination of the witnesses at the evidentiary hearing, including an extended cross-examination by Judge Sarmina herself.

Ignoring the jurisdictional time-bar and the rules of procedure, and all in a truncated death warrant time-frame leaving little time for appellate review in two court systems, the PCRA court essentially seized the files of the Commonwealth and the police for no legitimate reason (and certainly not based upon the required actual defense showing of exceptional circumstances), independently reviewed the materials, and then used that which was uncovered by the court to examine witnesses at an evidentiary hearing again scheduled for no legitimate reason. The court also entered some of the documents into the record on its own without any motion or prompting by appellee. Only thereafter, during the September 25th hearing, did appellee ask permission to amend the fourth PCRA petition to include the new allegations raised by the documents the judge had found, and the court immediately granted the request, reasoning that Chapter 900 of the Rules of Criminal Procedure—the same chapter containing the Rules respecting discovery and evidentiary hearings that were of no concern to the judge—supposedly indicated that there should be a liberal ability to amend, "even if it is at this late stage." N.T., 9/25/12, at 78.

**7.** Herbert Hamilton, another older man with whom appellee had a sexual relationship, was the first person appellee murdered.

Unfortunately, the PCRA court apparently allowed itself to be compromised by the fact that this was a capital case that was proceeding under an execution warrant. But, that is what happens, thirty years on, after a condemned capital petitioner has already exhausted five full rounds of review, and his federal lawyers try another longshot at delaying the case. Also, in taking these extreme, activist measures, the court cited a belief—proper enough in some spheres, and thus recognized in specific doctrines—that "death is different." The judge added: "This is not any regular, old PCRA, including in a non-capital case." N.T., 9/14/12, at 69. No, it was not an ordinary case, but not for the reason cited by the court: it was a last-ditch fourth state collateral petition, filed by the FCDO no less, after federal review had concluded, rehashing old claims that just happened to involve a two-time murderer finally facing the execution of his sentence.

This case demonstrates that the "difference of death" when reduced to an unmoored slogan causes mischief. The slogan does not create PCRA jurisdiction, and jurisdiction must be proven before the PCRA court can act. The difference of death is not a ground for ignoring this Court's Rules of Procedure, which specifically apply to—and in many instances exist specifically because of—capital cases. The difference of death also does not alter a trial court's crucial role as a neutral arbiter to pass upon the timeliness, and if timely, the merits of the claims that a serial PCRA petition actually raises. Five Ninth Circuit jurists recently commented on the abuse of the "death is different" notion in a dissent, explaining that the rule of law must be paramount:

> Whatever they are, motivations are beside the point. We should follow the law. Instead, we lay flame to orderly case-processing rules, comity due to state court judgments, and principles of finality. "[Fire's] real beauty is that it destroys responsibility and consequences. A problem gets too burdensome, then into the fire with it." Ray Bradbury, *Farenheit 451* 109 (Simon & Schuster 2012). We should be more cautious.

*Henry v. Ryan,* 766 F.3d 1059, 1072 (9th Cir.2014) (Tallman, J., dissenting, joined by O'Scannlain, Callahan, Bea, & Ikuta) (dissenting from grant of *en banc* review in case where time for Circuit reargument had long passed, and U.S. Supreme Court had already denied *certiorari* ). Ultimately, the PCRA court here lost sight of its limited, albeit crucial, role.

As a consequence, the PCRA court steered its own course away from the actual *Brady* claim presented in this time-barred serial petition; and the *Brady* claim forming the basis for the penalty phase relief the PCRA court granted could not retroactively establish jurisdiction so as to justify the lawless discovery and evidentiary hearing that had already occurred per the court's *sua sponte* directives. To make matters even worse, the claim the court discovered on its own was simply a different, frivolous *Brady* claim.

## IV. *Brady* Law

The 1984 murder here was appellee's second murder. His first murder victim, Herbert Hamilton, was another man with whom he had a sexual relationship, a relationship appellee denied. At the trial in this case, appellee testified to his absolute innocence, claiming he did not even know the victim. As all now agree, this sworn testimony was a lie since appellee not only knew the victim, but he had an ongoing homosexual relationship with him. But, it is the story appellee elected to tell the jury in the hopes, however desperate, of an acquittal. It is not the first time a criminal defense was premised upon a lie, but it is a defendant's right to pursue the defense he chooses (even if it risks a subsequent perjury prosecution, which is hardly a disincentive to a serial murderer in appellee's circumstances).

The new *Brady* claim discovered by the PCRA court's efforts involved "dirt" about the victim: that he was a "homosexual ephebophiliac" who had sexual encounters with male teenagers. Specifically, as explained by the Majority, the claim was that information that the victim was a homosexual ephebophiliac could have been employed to paint an unsympathetic picture of the victim at the penalty phase. Majority

op. at 550–51, 105 A.3d at 1244–45. Nothing in the death penalty statute, however, makes slander about a victim a relevant consideration. The death penalty statute does not recognize an exception if the murder victim was a sexual deviant, or even a convicted sex offender; and smearing the victim's character would not rebut the two aggravators the jury found: the commission of a felony (robbery) along with the murder, and the significant history of violent felony convictions, which included the murder of Hamilton, and a Christmas Eve, home invasion gunpoint robbery of an older couple— where appellee pressed a rifle to the woman's neck and threatened to blow "her fucking head" off, and then fired multiple shots into the wall. Nor would such evidence be probative of a mitigating circumstance. *See Commonwealth v. May*, 587 Pa. 184, 898 A.2d 559, 566 (2006) (testimony designed only to smear murder victim's character not relevant; noting as "apt" trial court's analysis that: "it's just as illegal to kill the devil as it is to kill a saint"). And, when the defendant takes the stand and swears he had nothing to do with killing the victim, and did not even know him, it clearly limits his penalty phase options respecting mitigation arising from "the circumstances of the offense."

The linking assumption depends upon a pet *Brady* theory the FCDO has been raising recently, i.e., that *Brady* is violated by non-disclosures which, though involving information neither exculpatory nor material in and of itself, in hindsight might have been used by trial counsel to keep the defendant from testifying and perjuring himself, thereby altering the focus of the necessary *Brady* materiality inquiry. *See Commonwealth v. Weiss*, 622 Pa. 663, 81 A.3d 767 (2013) (Castille, C.J., concurring, joined by Eakin J.) (further discussed and quoted *infra*). In the iteration posed here, the theory goes something like this: had additional information about the victim been disclosed, the defense would have learned appellee's "real" motive for murder (again, as if appellee did not know his motive), and perhaps trial counsel could have convinced appellee not to take the stand and lie, thus opening the door to an attack-the-victim defense at the

penalty phase. Even setting aside the irrelevancy of bad character information about a murder victim, *Brady* does not embrace this sort of perversity, a theory that rewards the defendant's trial perjury.

Furthermore, even if the PCRA court found something "unsporting" about the government's conduct revealed in the government's files that the court seized, and even if evidence of poor "sportsmanship" in discovery angered the judge, that is not the basis for a *Brady* claim. What matters is the legal point, made by the Majority, that there was nothing exculpatory or material in this information.[8] Appellee always knew of the victim's supposed proclivities; again, the current claim is just another version of the claim raised and litigated by the FCDO fifteen years ago. Nevertheless, the PCRA court drew a legal conclusion that the evidence respecting the victim was subject to *Brady* disclosure before the 1986 trial; and, if only the prosecution had disclosed non-exculpatory information already known to appellee about the victim's character, it may have changed appellee's guilt phase decision to testify; and, the theory goes on in speculation, may have altered the

---

8. In concisely summarizing why the PCRA court erred in finding that appellee's reconfigured-by-the-PCRA-court claim did not qualify under the governmental interference exception, based upon information appellee himself had known before trial, and supplemental information which he secured for use in a prior PCRA petition over fifteen years before, the Commonwealth succinctly explains:

When, at trial, defendant considered it in his interest to deny any sexual relationship with his victims so as to distance himself from their deaths, he made the strategic decision, **independent of any information in the government's possession**, to do so. And when that did not work, and he decided it was in his interest to instead claim in his first PCRA petition that he killed the victims [both here and in the Hamilton case] because they sexually abused him, he had no difficulty marshalling evidence **outside the government's possession** to support that version of events. At no point was his ability to defend against the charges, or to present any claim, constrained by the actions of the trial prosecutor or any other government official. Consequently, his untimely fourth PCRA petition, which he filed more than twenty years after his judgments of sentence became final, did not satisfy the governmental-interference exception to the one-year filing deadline. His petition was time-barred, and the PCRA court's order purporting to grant relief was a jurisdictional nullity that should be reversed.

Commonwealth's Brief as Appellant, 34 (emphasis original).

outcome of the penalty proceeding. *See* Appellee's Brief, at 29–30 (quoting PCRA court opinion).[9] The notion that this sort of evidence, in the context of a trial where appellee testified and denied any involvement, warrants *Brady*-based penalty phase relief, is ludicrous.

As the Majority notes, the U.S. Supreme Court has never held that *Brady* materiality is measured by the FCDO's effect-on-the-defense-trial-strategy theory; and a serial collateral attack is not the proper place to establish such constitutionally innovative new rules. Moreover, it would be absurd to grant *Brady* relief upon a claim that would involve rewarding a defendant for his own deliberate perjury at trial. I explained the error in this theory in my Concurring Opinion in *Weiss:*

> The *Brady* analysis argued by appellant is erroneous for several reasons. First, the U.S. Supreme Court has never embraced his interpretation. Indeed, appellant's claim to the contrary is premised upon a mischaracterization of *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Appellant states the following proposition as if it were black-letter law: "The proper *Brady* inquiry asks what 'course that the defense and the trial would have taken had the defense not been misled' and what impact the misconduct had on 'the preparation or presenta-

---

**9.** In point of fact, appellee never so much as offered to prove that, but for the alleged non-disclosure, he would have presented evidence detailing his ongoing, prior sexual relationship with the victim, and then claimed that the relationship was why he murdered the victim. Furthermore, the decision to testify was defendant's alone; his trial counsel's role was limited to consultation. In this regard, it is notable that, in the prior PCRA proceeding, where appellee litigated the same basic claim, trial counsel testified that he had negotiated a plea deal where appellee would receive life in prison—the best possible circumstance where appellee faced the death penalty, had substantial aggravators, and the fact of the robbery meant that his best, realistic prospect was a conviction for second-degree murder, which carries a mandatory life sentence. But, counsel testified, appellee was adamant that he was not willing to exchange his prayer of a hope for an outright acquittal for a term of life imprisonment. Appellee told counsel he would rather be executed than spend his life in jail. No claim but innocence could lead to acquittal, and appellee decided to go that route by then perjuring himself.

tion of the defendant's case.' *Bagley,* 473 U.S. at 683, 105 S.Ct. 3375." ... From his assertion that mere effects upon defense preparation, rather than hard evidence, is the measure of *Brady* materiality, appellant argues his more radical extended rule that he may shield himself from his own prior testimony.

However, *Bagley* supports neither appellant's "defense effects" root rule, nor his testimonial immunity extension of the rule. Appellant's [FCDO] counsel neglect to note that the *Bagley* language they cite and quote as governing black-letter law in fact represented the views of only two Justices in *Bagley.* It is not governing law. I examined and explained the non-precedential effect of this language at some length in my concurring opinion in *Commonwealth v. Willis,* 616 Pa. 48, 46 A.3d 648 (2012), a direct appeal case. *See id.* at 674–84 (Castille, C.J., concurring, joined by Eakin and McCaffery, JJ.) (addressing Court's erroneous apprehension of *Brady* materiality in *Commonwealth v. Green,* 536 Pa. 599, 640 A.2d 1242, 1245 (1994)).

Moreover, nothing in the logic of *Brady* materiality suggests a design to shield a defendant from his prior testimony or perjury. The test for *Brady* materiality is the same as the test for *Strickland [v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ] prejudice: whether there is a reasonable probability that the outcome of the proceeding would have been different. *See Kyles v. Whitley,* 514 U.S. 419, 433–35, 115 S.Ct. 1555, 131 L.Ed.2d 490 (U.S.1995) (noting that *Bagley* adopted *Strickland* formulation for *Brady* claims). The test, whether for *Brady* or *Strickland,* looks to the proceeding that actually occurred and attempts to assess its underlying fairness. *See id.* at 451, 115 S.Ct. 1555; *see also Bagley,* 473 U.S. at 678, 105 S.Ct. 3375. The High Court has never held that courts, charged with assessing *Brady* materiality by re-examining the trial that occurred in light of previously suppressed evidence, are obliged to diminish the record at that trial. Accordingly, appellant's theory is a non-starter. The expansion, if there is to be one, should come from the High Court.

Second and relatedly, this is a PCRA appeal. An assessment of the fairness of appellant's trial—whether he poses a *Brady* claim, a *Strickland* claim, or any other claim—is not measured by minority views in prior decisions or by hopeful predictions of where federal decisional law might someday go; it is measured by the existing law that governs. The only federal decisional law that governs in Pennsylvania is that commanded by the U.S. Supreme Court.... And, errors in such predictions [of where the law might develop] favoring the defense run the risk of arbitrarily releasing murderers.

*   *   *   *   *   *

Finally, I believe it is extremely unlikely that the U.S. Supreme Court would adopt a *Brady* materiality extension ... which would immunize a defendant against the effects of his own trial testimony, much less his own false trial testimony. To borrow from the *Strickland* jurisprudence from which *Brady* materiality derives:

It is true that while the *Strickland* test provides sufficient guidance for resolving virtually all ineffective-assistance-of-counsel claims, there are situations in which the overriding focus on fundamental fairness may affect the analysis. Thus, on the one hand, as *Strickland* itself explained, there are a few situations in which prejudice may be presumed.... And, on the other hand, there are also situations in which it would be unjust to characterize the likelihood of a different outcome as legitimate "prejudice." Even if a defendant's false testimony might have persuaded the jury to acquit him, it is not fundamentally unfair to conclude that he was not prejudiced by counsel's interference with his intended perjury. *Nix v. Whiteside,* 475 U.S. 157, 175–176, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986).

Similarly, in [*Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) ], we concluded that, given the overriding interest in fundamental fairness, the likelihood of a different outcome attributable to an incor-

rect interpretation of the law should be regarded as a potential "windfall" to the defendant rather than the legitimate "prejudice" contemplated by our opinion in *Strickland* Because the ineffectiveness of Fretwell's counsel had not deprived him of any substantive or procedural right to which the law entitled him, we held that his claim did not satisfy the "prejudice" component of the *Strickland* test.

*Williams v. Taylor*, 529 U.S. 362, 391–93, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (citations and footnotes omitted). *Cf. Commonwealth v. Cox*, 581 Pa. 107, 863 A.2d 536, 556–57 (2004) (Castille, J., concurring) (strong argument to be made that heightened prejudice standard under *Lockhart* should be applied to ineffectiveness claims with "fundamental substantive issues that would have to be resolved in defendant's favor before relief could be granted"); *United States v. Day*, 285 F.3d 1167, 1171 (9th Cir.2002) ("Because a defendant does not have a 'right' to commit perjury without suffering the consequences, the fact that counsel's ineffectiveness gave [defendant] an opportunity to commit perjury does not constitute deprivation of a right; accordingly, this portion of the sentence does not satisfy the prejudice component of *Strickland*."). Again, in explicating both *Brady* and *Strickland*, the High Court has stressed the overriding concern of whether the defendant has received a fair trial. Fairness works two ways, the High Court teaches. When the defendant takes the stand and elects to testify, and then testifies absurdly or untruthfully, I doubt that the U.S. Supreme Court would hold that *Brady* requires courts to pretend that his testimony never existed.

*Weiss*, 81 A.3d at 810–13 (Castille, C.J., concurring, joined by Eakin, J.) (footnotes omitted).

For these specific reasons, in addition to those set forth by the Majority on the time-bar and the merits, the new *Brady* claim fashioned by the PCRA court here provides no grounds for serial petition jurisdiction, much less PCRA relief.

## V. Conclusion

The FCDO's agenda and tactics by now should be predictable: this group has been aptly described, by a federal judge, as "gaming a system and erecting roadblocks in aid of a singular goal—keeping [the defendant] from being put to death." *See Abdul Salaam v. Beard,* 16 F.Supp.3d 420, 511 (M.D.Pa.2014). That gaming is bad enough; but, what is disheartening here is that the PCRA court became unmoored from its lawful duty. Trial courts faced with serial petitions in capital cases must be vigilant to protect against frivolous claims, and must be aware of their own actual duties; the PCRA judge here was not.

